Filed: November 21, 2011

IN THE SUPREME COURT OF THE STATE OF OREGON

STATE OF OREGON,

Plaintiff-Adverse Party,

v.

GARY HAUGEN,

Defendant-Relator.

(CC 04C46224; SC S059519)

En Banc

Joseph Guimond, Judge.

On Request for Court and/or the Chief Justice to Act on its Own Motion and Issue an Order Enforcing the Alternative Writ of Mandamus, Issued June 29, 2011, filed October 17, 2011; considered and under advisement on November 2, 2011.

Jeffrey E. Ellis, Oregon Capital Resource Center, Portland, filed the request and reply on behalf of Oregon Capital Resource Center.

Timothy A. Sylwester, Assistant Attorney General, Salem, filed the response for Adverse Party State of Oregon. With him on the response were John R. Kroger, Attorney General, and Anna M. Joyce, Solicitor General.

Greg Scholl, of Metropolitan Public Defender, Hillsboro, filed the response for Relator Gary Haugen.

BALMER, J.

The request submitted by Oregon Capital Resources Center to enforce the June 29, 2011, writ is denied.

Walters, J., dissented and filed an opinion in which De Muniz, C. J., and Durham, J., joined.

De Muniz, C. J., dissented and filed an opinion in which Durham and Walters, JJ., joined.

BALMER, J.

This matter comes to this court on a "request" that it enforce, on its own motion, an alternative writ of mandamus that it previously issued in connection with Gary Haugen's death-warrant proceeding. After that writ issued, this court determined that it had been complied with, and then *sua sponte* dismissed it. The request to now enforce the dismissed writ is premised on an assertion that the trial court did not comply with the writ. The request is filed by Oregon Capital Resource Center (OCRC), an organization that, when it attempted to participate in the earlier mandamus proceeding, failed to establish any right or authority to do so.[1] As we will explain, we deny OCRC's request, without deciding whether OCRC properly may make it, because we conclude that the judge to whom the writ was addressed has taken the actions that the writ required.

We begin by describing the procedural posture in which OCRC's request arises. We then turn to the contrary arguments advanced by OCRC and the contrary legal analysis urged by the dissenting members of the court.

## I. BACKGROUND

This court affirmed Haugen's aggravated murder conviction and death

---

[1] Specifically, this court concluded that OCRC had not made the necessary showing of legal authority to bring the action under ORS 34.105 to ORS 34.320. In particular, under ORS 34.105(4), a relator in a mandamus proceeding must be "the beneficially interested party on whose relation" the proceeding is brought. OCRC brought the petition alleging Haugen to be the relator, while also acknowledging that it did not represent Haugen. The court decided that OCRC had not made the necessary showing of legal authority to bring the proceeding on Haugen's behalf.

1

sentence. *State v. Haugen*, 349 Or 174, 243 P3d 31 (2010). Judge Guimond, who had been the trial judge, then held a hearing on whether to issue the death warrant. Haugen was represented at the hearing by two lawyers, Simrin and Goody. Before the hearing, Haugen had made clear his desire to waive all further challenges to his conviction and sentence. Simrin and Goody, however, believed that Haugen was not competent to be executed. They filed a motion to declare Haugen incompetent, supported by Goody's declaration that Haugen had been interviewed and evaluated by a neuropsychologist, Dr. Lezak, who had concluded that Haugen was not competent to be put to death.

At the hearing, before considering Simrin and Goody's motion, Judge Guimond received a letter from Haugen, asking him to remove Simrin and Goody as his lawyers and to permit him to proceed *pro se*. Simrin and Goody objected to being removed as Haugen's lawyers, arguing that Judge Guimond had to hold a so-called "Faretta" hearing before accepting Haugen's waiver of counsel and permitting him to go forward without representation; Simrin and Goody urged that Lezak's evaluation was relevant and necessary to that issue.[2] Judge Guimond disagreed on the necessity of an

---

[2] A "Faretta" hearing refers to a hearing comporting with *Faretta v. California*, 422 US 806, 95 S Ct 2525, 45 L Ed 2d 562 (1975), in which the United States Supreme Court articulated the test for a valid waiver of the Sixth Amendment right to counsel. *See generally State v. Meyrick*, 313 Or 125, 831 P2d 666 (1992) (discussing requirements of inquiry into a defendant's exercise of the right to waive counsel under both state and federal constitution). This court has explained that a colloquy on the record between the court and a defendant in which the court, "in some fashion, explains the risks of self-representation" is generally the preferred means of assuring that the defendant understands those risks. *Meyrick*, 313 Or at 133-34. Simrin and Goody did not cite or otherwise refer to the procedures under ORS 137.464, which, as we later

2

evidentiary hearing, and instead conducted a colloquy with Haugen. After doing so, and after advising Haugen of the risks of proceeding without counsel, Judge Guimond found Haugen to be competent, concluded that he was knowingly choosing to proceed *pro se*, and discharged Simrin and Goody. Judge Guimond, however, simultaneously appointed Simrin and Goody as "stand by" counsel to provide legal advice to Haugen at any point at which he might want that advice. Judge Guimond then asked Haugen a series of questions. Based on Haugen's responses to those questions, Judge Guimond concluded that Haugen was validly waiving his rights to further challenge his conviction and sentence. Judge Guimond issued a death warrant setting a date for Haugen's execution.

After the death warrant issued, OCRC filed a petition for a writ of mandamus contending that the trial court had discharged Haugen's lawyers and issued the death warrant without a sufficient inquiry into Haugen's competence. In support of that petition, OCRC filed an affidavit by Lezak attesting that, in her opinion, Haugen was not competent to be executed. Simrin and Goody, Haugen's discharged lawyers, submitted a letter supporting the petition. The state opposed the petition, arguing that OCRC lacked standing to file it. Haugen, appearing *pro se*, also opposed the petition, arguing principally that neither OCRC nor Simrin and Goody had authority to represent him or to seek relief on his behalf. Haugen also claimed that Simrin and Goody had divulged

explain, apply at a death warrant hearing in which the defendant wants to waive counsel and there is a substantial question about the defendant's mental capacity to represent himself or herself adequately.

3

privileged and confidential attorney-client communications in their letter to the court, without his authorization.

This court concluded that OCRC had not made the necessary showing that it had any legal authority to bring the proceeding on Haugen's behalf. The court further concluded, however, that Simrin and Goody, as Haugen's former lawyers, had authority to challenge Haugen's competency to discharge them. We therefore construed Simrin and Goody's letter as a petition for an alternative writ challenging certain findings, rulings, and orders that Judge Guimond had entered, including the order discharging Simrin and Goody without adequate procedures to determine Haugen's competence to waive counsel and proceed *pro se*. Having so construed Simrin and Goody's letter, this court issued an alternative writ of mandamus directed to Judge Guimond.

In the order issuing the writ, the court described the state of the record at that point -- Simrin and Goody had obtained Lezak's evaluation, Lezak had concluded Haugen was not competent to be executed, and Simrin and Goody had sought an evidentiary hearing on the issue of Haugen's competency, which Judge Guimond had denied. Given those facts, this court concluded that Judge Guimond had been obligated to follow certain statutory procedures -- ones that he had not followed -- before discharging Simrin and Goody and allowing Haugen to proceed *pro se*. In particular, the court noted, ORS 137.464 provides that, at a death warrant hearing, if a defendant wishes to waive his or her right to counsel and the trial court has "substantial reason to believe that, due to mental incapacity, the defendant cannot engage in reasoned choices of legal strategy and options," then the trial court "shall order" that the Oregon Health Authority

4

or its designee assess the defendant's mental capacity. The writ therefore directed Judge Guimond to vacate his related findings, rulings, and orders, including "[t]he finding that defendant Haugen is competent to waive his right to counsel" and "[t]he order removing Simrin and Goody as counsel for defendant Haugen[.]" Judge Guimond was ordered to then take the following further actions or to show cause for not doing so:

"1. Pursuant to ORS 137.464, order that the Oregon Health Authority or its designee perform an assessment of the defendant's mental capacity to engage in reasoned choices of legal strategies and options;

"2. Pursuant to ORS 137.463(3) and (4), after completion of the assessment by the Oregon Health Authority or its designee and any other inquiry you deem appropriate, and before issuing a death warrant, hold an evidentiary hearing and

"a. permit Simrin and Goody to offer evidence pertinent to defendant Haugen's mental capacity to make a competent, knowing, and voluntary waiver of his rights and to the question of whether defendant is competent for the purposes of being executed;

"b. advise defendant Haugen that he is entitled to counsel in any post-conviction proceeding and that counsel will be appointed if the defendant is financially eligible for appointed counsel at state expense;

"c. determine whether defendant [Haugen] wishes to waive counsel, and whether that waiver is competent, knowing, and voluntary;

"d. make findings on the record whether defendant Haugen suffers from a mental condition that prevents Haugen from comprehending the reasons for the death sentence and its implication; and

"e. determine whether defendant Haugen intends to pursue any challenges to the sentence or conviction and, if not, advise defendant Haugen of the consequences and make a finding on the record whether the defendant competently, knowingly, and voluntarily waives the right to pursue available challenges to his death sentence."

The alternative writ issued on June 29, 2011. Immediately after it issued, Haugen wrote letters to this court vigorously objecting to its issuance. Among other

5

points, he objected to having Simrin and Goody reinstated as his attorneys, asserting that they had a conflict of interest in representing him. Haugen also objected to any use or disclosure of Lezak's evaluation or her opinion of his competency without his written consent. Haugen asserted that his interview with Lezak was confidential and subject to a privilege that he had not waived; that Simrin and Goody had not adequately advised him in connection with Lezak's evaluation; and that Simrin and Goody's actions in disclosing Lezak's opinion without his consent were both unethical and illegal. Haugen asked this court, if it determined that Haugen did not have a right to object to the release of information about Lezak's examination, to appoint independent counsel to represent him on that issue.

This court responded to Haugen by letter, advising him that the case had been returned to the circuit court, where further proceedings were to be conducted. The court informed Haugen that copies of his letters raising his objections would be provided to Judge Guimond. The court's letter also acknowledged Haugen's request to have separate counsel appointed to represent him on "medical records and other issues." The letter advised Haugen that copies of his letters would be forwarded to the Office of Public Defense Services for "their consideration and further action as warranted." The court's letter so advising Haugen was copied to, among others, Judge Guimond and all counsel involved, including Simrin and Goody.

Meanwhile, Judge Guimond opted to comply with the writ rather than show cause for not doing so. Judge Guimond promptly reinstated Simrin and Goody as Haugen's counsel. He also directed the Oregon Health Authority to assess Haugen's

6

competence. Finally, he scheduled an evidentiary hearing to determine Haugen's competence, to be held after that evaluation was completed.

On July 14, 2011, Haugen notified Judge Guimond that he wanted Simrin and Goody to be removed as his counsel. Haugen did not, however, ask to proceed *pro se*. Instead, Haugen requested substitute counsel. In making that request, Haugen raised substantially the same issues that he had raised with this court immediately after the writ issued -- including that Simrin and Goody had violated the confidentiality of his examination by Lezak by disclosing the results without his consent and that they had acted unethically and illegally. Judge Rhoades, rather than Judge Guimond, presided at the hearing on Haugen's motion for substitution. She determined that a conflict of interest existed between Haugen and his counsel, based on an irremediable breakdown in their attorney-client relationship. Judge Rhoades accordingly removed Simrin and Goody as Haugen's counsel and ordered a substitution of counsel. Within a few days, different lawyers -- Scholl and Gorham -- were appointed to represent Haugen.

On July 15, 2011, Simrin and Goody filed a second petition for a writ for mandamus, challenging Judge Rhoades's decision to remove them as Haugen's counsel and to substitute different counsel in their place. This court denied that petition three days later.

On August 5, 2011, this court on its own motion dismissed the alternative writ that had issued on June 29, 2011, directing Judge Guimond to take particular actions in connection with the death warrant proceedings. The court did so, reciting that Judge Guimond had notified the court that he would comply with the alternative writ and that,

7

"[f]rom our review of [the] OJIN [register] entries, it appears that Judge Guimond has taken the actions necessary to comply with that writ." As noted, Judge Guimond had vacated his earlier orders and had taken certain other actions directed by the writ. The evidentiary hearing that the writ contemplated, although scheduled, had not yet occurred when that dismissal order issued. Neither the parties to the writ proceeding nor OCRC objected to the writ's dismissal, however.

After substitute counsel were appointed to represent Haugen, Dr. Hulteng was selected to perform the evaluation of Haugen on behalf of the Oregon Health Authority. Hulteng performed that evaluation and submitted his assessment that Haugen is competent. Judge Guimond then held a hearing at which the lawyers for the parties were permitted to offer further evidence on Haugen's competency.[3] At that hearing, Scholl, Haugen's lead counsel, did not offer Lezak's affidavit or other evidence of Lezak's opinion of Haugen's competency. Rather, the only expert evidence presented at that hearing was Hulteng's evaluation. Hulteng's written report was placed in evidence, and Hulteng testified at the hearing. Counsel for both sides questioned Hulteng about his assessment of Haugen's mental competence. At the conclusion of the hearing, based on Hulteng's written report and in-court testimony, Judge Guimond concluded that Haugen was competent to waive any further challenges to his conviction and sentence and that he

---

[3] What we describe as a single hearing was held on September 27, 2011, and October 7, 2011, and encompassed proceedings relevant to both the evidentiary hearing on competency, as well as other proceedings required as part of the death warrant hearing.

8

is competent to be executed.[4]

## II. COMPLIANCE WITH THE WRIT

A. *OCRC's Request and Status*

On October 17, 2011, OCRC filed the "request" that brings this matter before the court. OCRC's specific request is for "this court and/or the Chief Justice to act on its own motion and issue an order enforcing [the] alternative writ of mandamus."

The threshold problem with OCRC's request is that it is made by OCRC, rather than by a party with a demonstrated interest in the proceeding. In the order issuing the alternative writ of mandamus, we stated that "OCRC has not made the necessary showing of legal authority to bring this proceeding on behalf of Haugen under ORS 34.105(4)." We concluded that Simrin and Goody had authority to seek mandamus, because the trial court had permitted Haugen to discharge them and proceed *pro se* without first holding a hearing to determine his competence to do so. In its request to now enforce the writ of mandamus, OCRC has not offered any additional reason why it was entitled in that original petition to seek mandamus on Haugen's behalf. If OCRC lacked authority to seek a writ of mandamus in the first place, it necessarily follows that it lacks authority to seek to enforce the writ that we issued.

---

[4] When OCRC filed the request for this court to enforce the writ, Judge Guimond had not signed a death warrant setting the date of Haugen's execution. Judge Guimond, on November 18, 2011, did so. Haugen's execution is now scheduled for December 6, 2011.

For present purposes, however, we assume that this court, having dismissed the writ on its own motion, could reinstate the writ on its own motion, if the dismissal had been issued by mistake or in error. And we assume further that, although OCRC has not established any authority to make the request that it makes, we are not precluded from considering its arguments in determining whether to act on our own motion. We look past those potential issues because the trial court fully complied with the writ.

B.     *Judge Guimond's Actions after the Writ Issued*

We have already quoted the writ, at length and *verbatim*. The operative directives were straightforward in what they required. As pertinent here, the terms of the June 29, 2011, alternative writ stated four directives to Judge Guimond: to vacate certain findings and orders; to order the Oregon Health Authority or its designee to conduct an assessment of defendant Haugen's competence; to hold a hearing to determine Haugen's competence after receiving that assessment; and to permit Haugen's counsel at that hearing to offer evidence bearing on Haugen's competence.

Judge Guimond has complied with those directives. In particular, he

- vacated his earlier orders and, in doing so, reinstated Simrin and Goody as Haugen's counsel;

- ordered the Oregon Health Authority to perform an assessment of Haugen's mental capacity pursuant to ORS 137.464, which Hulteng then performed;

- held an evidentiary hearing to determine Haugen's mental capacity before issuing a death warrant; and

- permitted Haugen's counsel at that hearing to offer further evidence pertinent to Haugen's mental capacity.

Those were the actions that the writ contemplated. When this court

10

dismissed the writ on August 5 after concluding that it had been complied with, the evidentiary hearing had not yet occurred. But it was scheduled to occur. That was sufficient for this court to determine that Judge Guimond had complied with the writ. Compliance did not require that the court know what evidence would be offered or admitted at the hearing; compliance did not require the court to know the outcome of the hearing.

Our dismissal of the writ was correct when it issued on August 5. It remains correct now. The writ required Judge Guimond to take the steps outlined above, which he had committed to doing when the dismissal occurred, and which he has since done. Judge Guimond followed through on all procedural actions that our writ required. No further enforcement of the writ is necessary or appropriate.[5]

### III. THE ARGUMENTS TO THE CONTRARY

We turn to the arguments to the contrary advanced by OCRC and the two dissenting opinions. Those arguments center on three issues: (1) whether our writ commanded that Simrin and Goody have a role in the death warrant proceedings

---

[5] The fact that a writ of mandamus has been complied with does not mean that this court has no authority to direct further or different actions on the official's part based on circumstances that may arise after a writ issues. But for the court to have that authority requires a further petition for a writ of mandamus, one addressed to any further or different actions to be ordered and to the official's legal duty to perform them. And that petition must be brought by someone who makes the necessary showing of interest to bring it. No one has come before the court seeking a new or further writ of mandamus. OCRC's request is limited to a claim that the trial court did not comply with the writ that the court issued on June 29. Our disposition is limited to a denial of that request.

11

regardless of their status as Haugen's lawyers; (2) whether our writ commanded that Lezak's opinion on Haugen's competency be considered by Judge Guimond regardless of whether any party to the proceeding offered it in evidence; and (3) whether the evidentiary hearing held by Judge Guimond comported with due process requirements. We address those issues in turn. Although we ultimately disagree with the conclusions reached in the dissenting opinions, we do so with respect for the legal analyses that are offered in those opinions and for the views of the members of the court who have authored and have joined them.

A.    *The Role of Simrin and Goody*

Both dissenting opinions argue that Judge Guimond failed to comply with this court's writ because he did not have Simrin and Goody present evidence regarding Haugen's competency at the evidentiary hearing conducted after issuance of the writ. The dissents rely on the fact that the writ referred to Simrin and Goody by name. Their position in that regard, however, fails to take into account (a) the context in which the writ issued; (b) the text of the writ itself; (c) the proceedings in the trial court and this court following the June 29, 2011, writ; and (d) the events that did and did not transpire at the post-writ evidentiary hearing held by Judge Guimond.

First, the court issued the writ because it concluded that Simrin and Goody's status as Haugen's "stand by" counsel after the trial court had allowed Haugen to discharge them permitted them to take -- or at least did not prohibit them from taking -- "any legal action to challenge Haugen's competency to discharge them." Accordingly, we construed Simrin and Goody's letter to the court as a petition for an alternative writ of

12

mandamus and, on that basis, issued the writ. Simrin and Goody thus were not lawyers who were strangers to the case petitioning to participate in the proceedings; rather, as our order explained, they were Haugen's recently discharged counsel -- now serving as "stand by" counsel for him in the death warrant proceeding at issue. Moreover, Haugen had just been found by the trial court to be competent (without the trial court having the benefit of expert testimony), had waived his rights to further challenges to his sentence, and had been given an execution date -- all at a hearing in which he was not represented by counsel. For those reasons (among others), we issued the June 29 writ directing Judge Guimond to vacate his earlier rulings, to order an examination by the Oregon Health Authority, and to hold an evidentiary hearing pursuant to the procedures prescribed by ORS 137.463 and ORS 137.464.

It was in that context that we directed Judge Guimond to "permit Simrin and Goody to offer evidence pertinent to defendant Haugen's [competence]." Nothing in the court's order issuing the writ conferred any special "ombudsman," "next friend," or similar status on Simrin and Goody. Rather, it identified them by name because they were Haugen's recently discharged lawyers and had filed the petition that resulted in the issuance of the writ.

Second, the text of the writ itself stated that the trial court should "permit" Simrin and Goody to offer evidence pertaining to Haugen's mental state. The writ conferred no right on them to appear in any capacity other than as Haugen's counsel. It did not require Judge Guimond to permit *them*, as opposed to other counsel for Haugen, to appear at the hearing. The writ did not *require* Simrin and Goody to offer any

13

evidence. It did not *require* Simrin and Goody to offer, or the trial court to admit, any particular evidence, including the Lezak affidavit.

If there were any question about Simrin and Goody's role as contemplated by the June 29 writ, that question is answered by events that occurred following the issuance of the writ. As we have noted, Haugen wrote this court asserting that Simrin and Goody had a conflict of interest with him, had not advised him adequately in connection with Lezak's evaluation, and had disclosed Lezak's opinion in violation of his claims of privilege and confidentiality. Haugen requested independent counsel on the "medical and other issues" if this court concluded he could not object to disclosure of Lezak's opinion. This court did not treat those issues as resolved by the writ. Instead, this court referred Haugen's objections to the circuit court, and forwarded his request for independent counsel on those issues to the appropriate appointing entity. Haugen then moved for a substitution of counsel at the circuit court level. Judge Rhoades held a hearing on Haugen's motion, determined that Simrin and Goody had a conflict of interest, and removed Simrin and Goody. Judge Rhoades also appointed Scholl and Gorham to represent Haugen. Simrin and Goody filed a mandamus petition seeking reversal of the order, and this court -- unanimously -- denied that petition on July 18, 2011.

This court was aware that those events had taken place on August 5, when it determined on its own motion that Judge Guimond had complied with the writ and dismissed it. If this court had viewed the June 29 writ as requiring Simrin and Goody specifically -- as opposed to other duly appointed counsel -- to participate at the death warrant hearing, it would have granted their mandamus petition challenging their

14

removal. Likewise, if this court had viewed the writ as requiring Simrin and Goody specifically -- as opposed to other duly appointed counsel -- to participate in the death warrant hearing, this court would not have concluded that Judge Guimond had complied with the June 29 writ and would not have dismissed it on its own motion. Simply put, those actions by this court cannot be reconciled with the dissents' views that the June 29 writ required that Simrin and Goody personally participate in the death warrant hearing and present evidence despite their status as lawyers who no longer represented Haugen and who have a conflict of interest with him.[6]

Finally, what occurred at the post-writ evidentiary hearing itself demonstrates that no one, including Simrin and Goody, interpreted the writ as mandating that they appear personally and present evidence on Haugen's competency, regardless of their status. At that hearing, Haugen was represented by counsel; he did not appear *pro se*, as he had in the initial death warrant hearing that led to issuance of our writ. Judge Guimond did not find Haugen to be competent based solely on his own colloquy with Haugen, as happened in the initial death warrant hearing. Instead, Judge Guimond also relied on the evidence presented by the parties at the evidentiary hearing, as our writ

---

[6] Justice Walters suggests that this court denied the mandamus petition that Simrin and Goody filed to challenge their removal as counsel and the substitution of Scholl and Gorham, assuming that Scholl and Gorham would take the same positions in representing Haugen (including introducing evidence that he was *not* competent) as Simrin and Goody had. Nothing in the record supports that assertion, and the court took no official action consistent with it. As discussed elsewhere in this opinion, this court does not and should not purport to control the choices made by counsel in representing their clients. We did not do so here.

required. The evidence both parties chose to present was Hulteng's evaluation -- which was the expert evaluation contemplated by the statutory procedure that our writ ordered Judge Guimond to invoke. Simrin and Goody did not appear at the hearing, did not seek to participate, and did not offer evidence. Their inaction at least suggests that they, too, understood the writ to be directed to them only insofar as they remained Haugen's lawyers.[7]

B.    *The Lezak Affidavit*

In urging that the writ must be enforced because Judge Guimond has not complied with it, OCRC's arguments rest principally on the assertion that the writ required Judge Guimond to consider Lezak's evaluation in making the competency determination. The dissenting opinions agree. Our writ, however, did not order Judge Guimond to do so.

To state the obvious first: the text of the June 29 writ does not direct Judge Guimond to consider the Lezak affidavit. Had this court concluded that a reliable determination of Haugen's competence could not be made without evidence of Lezak's expert opinion, it would have directed Judge Guimond specifically to consider the Lezak affidavit, in terms that expressed that obligation. The writ, however, contained no such

---

[7]    Worth noting is that OCRC does not dispute the propriety of removing Simrin and Goody based on their conflict of interest with Haugen. Nor does OCRC, unlike the dissenting members of this court, assert that Simrin and Goody, once they were removed as Haugen's lawyers and different counsel were appointed to represent Haugen, had any proper role to play at the evidentiary hearing held pursuant to our writ.

16

directive. Insofar as Lezak's opinion of Haugen's mental competency in particular was concerned, the writ did not refer to it at all in the directives issued to Judge Guimond.[8] Rather, the writ was open-ended: Haugen's lawyers could "offer evidence pertinent to defendant Haugen's mental capacity to make a competent, knowing, and voluntary waiver of his rights and to the question of whether defendant is competent for the purposes of being executed." The writ did not order Judge Guimond to consider evidence regardless of whether it was offered by any party and was determined to be admissible. Nothing in the writ prejudged what evidence Haugen's lawyers might offer or preempted any disputes that might arise over evidence offered by either side. Instead, the writ commanded Judge Guimond to hold an evidentiary hearing, which he has done. It also commanded Judge Guimond to permit Haugen's lawyers to offer evidence pertinent to Haugen's competency, which he has also done. The writ ordered nothing more, and nothing less.

As events transpired, Simrin and Goody were replaced by Scholl and

---

[8]     The order issuing the June 29 writ, as opposed to the writ itself, discussed Lezak's opinion and relied, in part, on Simrin and Goody's attempt to present that evidence to Judge Guimond. The significance of Lezak's opinion to the issuance of the writ was that Simrin and Goody's attempt to offer evidence of her opinion at the initial death warrant hearing triggered Judge Guimond's obligation under ORS 137.464 to order an evaluation by the Oregon Health Authority and to hold an evidentiary hearing afterwards. Our writ concerned only what procedures Judge Guimond was required to follow. The dissenters view this court as having decided what evidence should be offered and considered by Judge Guimond in following the required procedures, but that was not an issue before us or one that we could have or should have resolved, given the limitations of our record and the procedural posture of the case. We did not address or resolve that issue when we issued the writ.

17

Gorham because Simrin and Goody had a conflict of interest with Haugen. Scholl, as Haugen's lead counsel, independently assessed the evidence on Haugen's competency, the legal issues involved, and his own ethical obligations to his client. Scholl properly did not consider himself bound to pursue whatever legal strategies and positions Simrin and Goody had pursued, as opposed to assessing those matters anew. Scholl decided to rely on Hulteng's evaluation, which was the expert evaluation contemplated by the statutory procedure that our writ ordered Judge Guimond to follow. Scholl specifically decided not to submit the Lezak affidavit at the evidentiary hearing.[9] By directing Judge

---

[9] In response to OCRC's request to enforce our writ, Scholl, as Haugen's lead counsel, has submitted an affidavit explaining his decision. Scholl knows Hulteng's work well, having worked with and against him on many different cases. Scholl was present during Hulteng's evaluation interviews of Haugen, and Hulteng allowed Scholl to question him and Haugen during the evaluation. In addition, Hulteng allowed Scholl to record the interviews by filming them. Based on his knowledge of Hulteng's work, Scholl considers Hulteng "a fair evaluator and a knowledgeable * * * expert." With regard to Hulteng's assessment of Haugen's mental competence specifically, Hulteng "is credible and unbiased in [Scholl's] opinion." Scholl states that, "[i]n the end, Dr. Hulteng's opinion about defendant's competency was very similar to my own view and that of defendant himself."

In his affidavit, Scholl explains that, in contrast to Hulteng's expert evaluation and opinion, Lezak's affidavit "does not offer a diagnosis, or present any detailed client history. It does not establish defendant's incompetence. As an attorney with experience in this area, I would not try to establish anyone's incompetency in court or otherwise with the information in that document." Scholl emphasizes that he "could have offered [Lezak's affidavit]" during the death warrant hearing if that affidavit was "thought credible and if it furthered the objectives of the representation." For Scholl, however, Lezak's affidavit seemed neither thorough nor complete. He declined to offer it at the evidentiary hearing on Haugen's competency.

Scholl, of course, is not a medical professional. However, he explained that, in the course of his work as the Director of the Washington County Section of

18

Guimond to permit Haugen's lawyers to offer evidence pertinent to Haugen's competency, the writ deferred to the judgment of Haugen's lawyers to decide what evidence to offer. That deference is consistent with how this court approaches virtually all significant legal proceedings, including those in death penalty proceedings.

The dissenting opinions question how a majority of this court can now conclude that Judge Guimond complied with this court's writ, when Simrin and Goody did not participate in the hearing and the Lezak affidavit was not considered. The reasons we have set forth above answer their question: Simrin and Goody presumably (and correctly) understood that, once they had been replaced as counsel by Judge Rhoades (with this court unanimously declining to vacate that action), they had no role to play in the hearing; they did not seek to appear at or participate in the hearing or to introduce the Lezak affidavit; and nothing in the order required Judge Guimond to *sua sponte* consider the Lezak affidavit.

C. *The Evidentiary Hearing on Haugen's Competency*

As noted, after Hulteng performed his evaluation of Haugen as the designee for the Oregon Health Authority, Judge Guimond held an evidentiary hearing to determine Haugen's competency. At that hearing, Haugen was represented by Scholl and Gorham, rather than by Simrin and Goody. As required by our June 29 writ, Judge

---

Metropolitan Public Defender, he has "litigated competency issues in my own cases, and assessed competency questions in the cases of other attorneys in the office. My work has required regular client competency analysis, and in more areas than just a client's ability to aid and assist in their own defense."

19

Guimond permitted Scholl and Gorham, as Haugen's counsel, "to offer evidence pertinent to defendant Haugen's [competence]," and they did so. As already described, Scholl, as Haugen's lead counsel, decided not to offer the Lezak affidavit; he relied on Hulteng's expert evaluation instead. Judge Guimond was presented with both Hulteng's written report and his testimony. Both parties examined Hulteng about his conclusions. No one has come to this court -- including OCRC -- challenging Hulteng's credentials, the thoroughness of his evaluation, or even his expert opinion. Judge Guimond made findings of fact based on the evidence so presented and concluded that Haugen was competent.

Justice Walters argues in dissent that Judge Guimond failed to comply with the writ because he did not hold a hearing at which "one side contends that Haugen is competent" and the "other side takes the contrary position * * *." However, our writ did *not* direct "one side" to present evidence of Haugen's competence and the "other side" to present evidence to the contrary. Rather, the writ simply ordered that a hearing be held at which the parties could "offer evidence pertinent to defendant Haugen's mental capacity to make a competent, knowing, and voluntary waiver of his rights and to the question of whether defendant is competent for the purposes of being executed[.]" The two "sides" at the hearing were the state and Haugen. Consistent with Oregon statutes and our adversarial legal system, the parties to the proceeding were permitted to present what counsel for each side determined to be appropriate evidence -- and they did so. Judge Guimond conducted the hearing required by the writ, and he permitted full participation by the parties as contemplated by the writ.

20

To the extent that OCRC and the dissents argue that the United States Supreme Court's decisions in *Panetti v. Quarterman*, 551 US 930, 127 S Ct 2842, 168 L Ed 2d 662 (2007), and *Ford v. Wainwright*, 477 US 399, 106 S Ct 2595, 91 L Ed 2d 335 (1986), require a different result, they read those cases for more than they hold. Those cases stand for the principle that, when a prisoner seeks a stay of execution and makes a "substantial threshold showing of insanity," due process requires that the state provide the prisoner with a hearing at which both the prisoner and the state are free to put on evidence. *Panetti*, 551 US at 949-50 (summarizing Justice Powell's opinion concurring in part and concurring in the judgment in *Ford*).[10] Neither the controlling opinion in *Ford* nor the majority opinion in *Panetti* suggests that the procedure that the trial court followed in this case violates the Due Process Clause.

## IV. CONCLUSION

This court's June 29 writ commanded Judge Guimond to take four actions pertinent here. He was to vacate certain findings and orders; to order the Oregon Health Authority or its designee to conduct an assessment of defendant Gary Haugen's competence; to hold a hearing to determine Haugen's competence after receiving that

---

[10] As the Court explained in *Panetti*, Justice Powell's opinion concurring in the judgment in *Ford* was narrower than Justice Marshall's plurality opinion regarding the procedures for determining competence. *Panetti*, 551 US at 949. Accordingly, because Justice Powell's opinion was necessary to form a majority position, it controls. *Id.* We note that OCRC relies on Justice Marshall's plurality opinion, even though it is not the controlling precedent on the process that the constitution requires to determine a prisoner's competency to be executed.

21

assessment; and to permit Haugen's counsel at that hearing to offer evidence bearing on Haugen's competence. Four members of this court so understood the writ in voting to issue it; four members of this court so understand it still. *A fortiori*, those are the writ's terms. Judge Guimond has complied with those directives.

The writ set out the directives described above. It did not require that particular evidence be provided to or considered by Judge Guimond, and it did not direct Judge Guimond to consider the Lezak affidavit regardless of whether Haugen's lawyers offered it in evidence. The writ did not give Simrin and Goody a personal right or legal role entitling them to present evidence on Haugen's competence -- their status was, and is, that of former lawyers for Haugen who have been discharged due to a conflict of interest and replaced by other duly appointed counsel. The writ did not preempt Haugen's counsel from choosing what evidence to offer at the evidentiary hearing based on their assessment of the evidence, the law, and their ethical responsibilities to their client. The adversarial process would be ill-served were we to prevent Haugen's lawyers from making those choices, or were we to take action to override or circumvent those choices. We did not do so in issuing the writ, and we decline to do so now, on our own motion, by enforcing the writ on revised terms.

Our conclusion that Judge Guimond has complied with the writ, of course, does not make this case any less fraught or sobering. We agree with the dissenting opinions that, as this court and the United States Supreme Court have said, "death is different." *Woodson v. North Carolina*, 428 US 280, 305, 96 S Ct 2978, 49 L Ed 2d 944 (1976); *State v. Haugen*, 349 Or 174, 203, 243 P3d 31 (2010). And we agree that the

22

procedures established by the legislature that can lead to an execution must be followed scrupulously.  We share the dissenters' premise that every death penalty case raises the most profound issues of morality and social justice.  The record before us, however, demonstrates no legal error in Judge Guimond's conduct of the proceedings to determine Haugen's competence, nor any failure on his part to comply with the terms of our writ.

The request submitted by Oregon Capital Resources Center to enforce the June 29, 2011, writ is denied.

WALTERS, J., dissenting.

Because the law requires Judge Guimond to decide whether Haugen is mentally competent to be executed and because Judge Guimond has not yet considered expert testimony relevant to that issue, this court should not conclude that Judge Guimond "has complied" with this court's alternative writ of mandamus. That writ permitted counsel to present a challenge to Haugen's mental competence and evidence of Haugen's incompetence. Until Judge Guimond hears and considers that challenge and evidence, no death warrant should issue.

Before the death warrant hearing that Judge Guimond conducted on May 18, 2011, Haugen's lawyers, Simrin and Goody, filed a motion pursuant to ORS 137.463(4)(a), asking Judge Guimond to find that Haugen was not mentally competent to be executed or to set a hearing to consider evidence on that issue. Simrin and Goody explained that a neuropsychologist, Dr. Muriel Lezak, had conducted a neuropsychological assessment of Haugen's mental capacity and had informed them that she was prepared to testify to her opinion that Haugen was not mentally competent to be executed.[1] Judge Guimond declined to entertain Simrin's and Goody's motion or the

---

[1]  With their motion, Simrin and Goody filed a declaration summarizing the conclusion that Dr. Lezak had reached and to which they expected Dr. Lezak would testify. OCRC later attached a sworn affidavit from Dr. Lezak to the petition for writ of mandamus that it filed with this court. In that affidavit, Dr. Lezak states that Haugen suffers from a delusional disorder that "prevents him from comprehending the reasons for his death sentence or its implication[,]" rendering him incompetent to be executed under *Panetti v. Quarterman*, 551 US 930, 127 S Ct 2842, 168 L Ed 2d 662 (2007), *Ford v. Wainwright*, 477 US 399, 106 S Ct 2595, 91 L Ed 2d 335 (1986), and ORS

1

evidence that they proffered. Instead, after discharging Simrin and Goody at Haugen's request, Judge Guimond permitted Haugen to withdraw the motion. Judge Guimond then conducted a colloquy with Haugen and issued a death warrant.

This court issued its alternative writ of mandamus on June 29, 2011. This court explicitly ordered Judge Guimond to conduct a new "*evidentiary hearing*" and, at that hearing, to permit "*Simrin and Goody*" to "*offer evidence pertinent to * * * the question of whether defendant Haugen is competent for the purposes of being executed.*" (Emphases added.) The terms and context of that order required Judge Guimond to conduct the evidentiary hearing that Simrin and Goody had sought and to hear the evidence that they had proffered. This court's direction to Judge Guimond was not limited to ensuring that Haugen was represented by competent counsel or was mentally competent to waive his right to counsel. This court ordered Judge Guimond to reinstate Simrin and Goody -- lawyers who intended to challenge Haugen's competence to be executed -- and to permit them to present evidence pertaining to that challenge -- the testimony of Dr. Lezak.

This court anticipated that, at the evidentiary hearing that it ordered, the state and Haugen would take the position that Haugen *is* mentally competent to be executed. This court anticipated that Simrin and Goody would take the contrary position that Haugen *is not* mentally competent to be executed and to offer Dr. Lezak's testimony

---

137.463(6)(a).

2

to prove that fact. This court adhered to the view that "truth * * * is best discovered by powerful statements on both sides of the question[,]" *United States v. Cronic*, 466 US 648, 655, 104 S Ct 2039, 80 L Ed 2d 657 (1984) (internal citations omitted), and issued its writ to ensure that the issue of Haugen's mental competence to be executed would be tested, as our system tests all questions of fact, by subjecting it to the crucible of the adversary process.

This court now knows that Simrin and Goody no longer represent Haugen and that no lawyer has filled the role that it anticipated that Simrin and Goody would fill. No lawyer has challenged Haugen's mental competence to be executed or presented Lezak's opinion that he is incompetent. Because Judge Guimond has not heard or considered that challenge or that evidence, this court cannot conclude that Judge Guimond "has complied" with this court's order.

When this court entered its order dismissing the alternative writ of mandamus, it acted prematurely. ORS 34.250(6) provides that if the judge or court whose action is being challenged by a petition for a writ of mandamus "*performs* the act * * * required by the alternative writ," the relator shall notify, and the judge, court, or any party may notify, the Supreme Court that the judge or court "*has complied*." (Emphases added.) In this case, after this court entered its writ, Judge Guimond notified this court that he "would comply," and this court dismissed its writ on that basis. In fact, however, neither the relator, the judge, nor any party has notified us that Judge Guimond "*has complied*" with this court's order as ORS 34.250(6) requires. At the time that the court entered its order of dismissal, Judge Guimond had not held an evidentiary hearing as to

3

Haugen's mental competence to be executed, and this court did not know what evidence he would consider on that issue. This court should recall its order of dismissal and enter further orders enforcing and, if necessary, clarifying its writ.

This court should order Judge Guimond to vacate the findings and conclusions that he entered on October 7, 2011, stay Haugen's execution, and hold an evidentiary hearing on the issue of Haugen's mental competence to be executed. This court should order Judge Guimond to grant Simrin and Goody the status necessary to permit them to challenge Haugen's mental competence, or appoint alternate counsel to serve in that role. *See Wright v. Thompson*, 324 Or 153, 157, 922 P2d 1224 (1996) (assuming, *arguendo*, that Oregon law may provide third-party standing to seek relief for an incompetent convicted defendant); *Ford v. Haley*, 179 F3d 1342 (11th Cir 1999) (capital defendant's former lawyer retained standing to file appeal challenging district court's finding that capital defendant is mentally competent to discharge former counsel and its dismissal of habeas action); *Mason by and through Marson v. Vasquez*, 5 F3d 1220, 1223 (9th Cir 1993) (for purpose of competency hearing, court permitted participation of lawyer that defendant had discharged); and *Lenhard v. Wolff*, 603 F2d 91, 92-93 (9th Cir 1979) (per curiam) (dismissing writ of habeas corpus filed by capital defendant's former lawyers for lack of standing, but suggesting that result would have been different if there had been evidence that defendant was incompetent). This court should require Simrin and Goody, or alternate counsel, to present relevant evidence of Haugen's incompetence, including Dr. Lezak's assessment, opinion, and testimony. Finally, this court should grant Judge Guimond the alternative of contesting this court's

4

order and proceeding with briefing and oral argument.

Clearly, those are actions that this court has the jurisdiction and authority to order. Article VII (Amended), section 2, of the Oregon Constitution expressly confers on this court authority to, "in its own discretion, take original jurisdiction in mandamus * * * proceedings." If this court chooses to exercise that discretion (as it did in this case when it originally issued its June 29 order allowing the requested alternative writ of mandamus), it has at its disposal "all the means to carry [that jurisdiction] into effect[,]" ORS 1.160,[2] including, *particularly*, the authority to recall its own erroneous dismissal of a writ so that it may enforce or clarify that writ or determine whether the acts required have been performed.[3]

---

[2] ORS 1.160 provides:

"When jurisdiction is, by the Constitution or by statute, conferred on a court or judicial officer, all the means to carry it into effect are also given; and in the exercise of the jurisdiction, if the course of proceeding is not specifically pointed out by the procedural statutes, any suitable process or mode of proceeding may be adopted which may appear most conformable to the spirit of the procedural statutes."

[3] The authority of this court and, indeed, of any court of record in this state, to act to recall its previous orders cannot be denied. *See, e.g.*, *Bailey v. Steele*, 263 Or 399, 401, 502 P2d 586 (1972) ("the authority of a court to vacate or set aside its own judgments is an inherent power of all courts of record or of general jurisdiction and may be exercised without any special statutory authority"). This court has exercised that power previously, in the context of orders disposing of petitions for review. *See, e.g.*, *State v. Saner*, 342 Or 254, 149 P3d 1213 (2006) (on own motion, vacating order denying review); *Zimmerlee v. Baldwin*, 330 Or 281, 6 P3d 1100 (2000) (vacating on own motion denial of petition for review 14 months later); *Ponder v. Baldwin*, 330 Or 281, 6 P3d 1100 (2000) (on own motion, granting reconsideration and withdrawing order denying review); *Cooper v. Maass*, 329 Or 10, 994 P2d 119 (1999) (on own motion, reconsidering

5

In this case, Judge Guimond's failure to hear and consider Dr. Lezak's opinion that Haugen is incompetent to be executed presents serious constitutional implications. The Eighth Amendment to the United States Constitution, applicable to the states through the Fourteenth Amendment, prohibits a state from carrying out a sentence of death when a prisoner is not competent to be executed. *Panetti v. Quarterman*, 551 US 930, 127 S Ct 2842, 168 L Ed 2d 662 (2007); *Ford v. Wainwright*, 477 US 399, 106 S Ct 2595, 91 L Ed 2d 335 (1986). If a prisoner makes "'a substantial threshold showing of insanity,' the protection afforded by procedural due process includes a 'fair hearing' in accord with fundamental fairness." *Panetti*, 551 US at 949 (quoting *Ford*, 477 US at 426 (Powell, J., concurring)). Such a hearing must include the opportunity to submit "'evidence and argument from the prisoner's counsel, including expert psychiatric evidence that may differ from the State's own psychiatric examination.'" *Id*. at 950 (quoting *Ford*, 477 US at 427 (Powell, J., concurring)). To ensure that Oregon acts consistently with those constitutional mandates, Oregon law requires that a trial judge conduct a death warrant hearing in every case in which a defendant is sentenced to death, make an "appropriate inquiry" as to the defendant's mental capacity, and make findings

petition for review previously denied and withdrawing order denying review). Although, as indicated, the power to correct may be exercised without any special statutory authority, there also are statutes that explicitly address that authority. *See, e.g.*, ORCP 71A, C (providing that certain errors may be corrected by trial court at any time on its own motion and that "[t]his rule does not limit the inherent power of a court to modify a judgment within a reasonable time"); ORS 19.270(6)(a) (appellate court, which normally loses jurisdiction over cause when appellate judgment issues, retains jurisdiction to "[r]ecall the appellate judgment as justice may require").

6

on the record on that issue. ORS 137.463(2), (4)(a).

When this court reviewed the letter from Simrin and Goody that it construed as a petition for a writ of mandamus, it was not convinced that the death warrant hearing that Judge Guimond had conducted on May 18, 2011, satisfied those constitutional and statutory requirements. This court knew that a man's life hung in the balance, and it was not willing to tolerate the risk that, because Judge Guimond had failed to conduct an evidentiary hearing on the issue of Haugen's mental competence and to consider the expert evidence of Haugen's mental incompetence that his lawyers had proffered, Judge Guimond had wrongly issued a death warrant. *See Beck v. Alabama*, 447 US 625, 637-38, 100 S Ct 2382, 65 L Ed 2d 392 (1980) (Supreme Court decided that it could not tolerate a risk created by the lack of a different procedural safeguard -- the opportunity for a jury to consider convicting the defendant of a lesser-included offense).

Death is different in kind from all other sentences and requires heightened judicial scrutiny:

> "[T]he penalty of death is qualitatively different from a sentence of imprisonment, however long. Death, in its finality, differs more from life imprisonment than a 100-year prison term differs from one of only a year or two. Because of that qualitative difference, there is a corresponding difference in the need for reliability in the determination that death is the appropriate punishment in a specific case."

*Woodson v. North Carolina*, 428 US 280, 305, 96 S Ct 2978, 49 L Ed 2d 944 (1976). *See also Lockett v. Ohio*, 438 US 586, 605, 98 S Ct 2954, 57 L Ed 2d 973 (1978) (when choice is between life and death, risk of improper sentence is "unacceptable and incompatible with the commands of the Eighth and Fourteenth Amendments"). "Oregon

7

law also has long imposed stricter safeguards on potential capital cases than on other criminal proceedings." *State v. Wagner*, 305 Or 115, 189, 752 P2d 1136 (1988) (Linde, J., dissenting), *vac'd and rem'd sub nom*, *Wagner v. Oregon*, 492 US 914, 109 S Ct 3235, 106 L Ed 2d 583 (1989).

The majority agrees that death is, indeed, different, *see State v. Haugen*, 349 Or 174, 203, 243 P3d 31 (2010) ("To state the obvious, the penalty of death is different in kind from incarceration"), and apparently assessed OCRC's request that we enforce our writ of mandamus in that light. However, in declining to take action in response to the information that OCRC provided, the majority does not meet this court's obligation to see that Judge Guimond follows the constitutional and statutory procedures necessary to ensure the reliability of his decision.

The majority concludes that Judge Guimond "has complied" with this court's order because it does not interpret the writ to require Judge Guimond to consider Dr. Lezak's opinion. In the majority's view, it is enough, under the express terms of the writ, that Haugen had counsel -- Scholl -- and that Scholl chose not to present Dr. Lezak's opinion. The problem with that view is that Scholl's representation does not meet the terms or the purpose of the writ. The terms and purpose of the writ require that Judge Guimond hear from lawyers who take a position contrary to Haugen's and consider expert evidence that Haugen is mentally *incompetent* to be executed. In the affidavit that Scholl filed with this court, Scholl acknowledges that he did not advocate for that position or present that evidence. Scholl explains his belief that he is ethically required to abide by Haugen's decisions and to advance Haugen's personal position as Haugen directs.

8

The stark problem that this court faces is that two sets of lawyers have reached two contrary conclusions as to Haugen's mental competence to be executed. If Haugen *is* mentally competent, then he is entitled to determine his legal strategy and ask to be executed. Scholl represents that position. If Haugen *is not* mentally competent, the court must appoint lawyers to represent his best interests and advance legal positions in accordance with those interests. Simrin and Goody represent that position.[4] No neutral judge has decided which of those two sets of lawyers is correct. To this date, Judge Guimond has not conducted an evidentiary hearing at which one side contends that Haugen is competent, and the other side takes the contrary position, and presents Dr. Lezak's testimony and other evidence in support of that position, as Simrin and Goody were prepared to do. Haugen may be correct that he is mentally competent to be executed, and he certainly is entitled to the assistance of counsel in pressing that point. However, Oregon law requires a neutral judge, and not Haugen or lawyers acting at his direction, to decide that question of fact. ORS 137.463(4)(a). And a neutral judge cannot make that decision until the judge conducts a "fair hearing" in accordance with the Constitution of the United States and makes an "appropriate inquiry" as required by

---

[4] That fact that Simrin and Goody questioned Haugen's mental competence is an important factor in assessing Haugen's contentions that Simrin and Goody had a conflict of interest and should not have had him examined by Dr. Lezak or disclosed her opinion to the court. The ethical rules anticipate that a lawyer may need to take action against a client's personal wishes when the client suffers from diminished capacity. *See* Oregon Rules of Professional Conduct (RPC) 1.14(b) (lawyer may take necessary action to protect client with diminished capacity even if action against client's wishes).

Oregon law, considering not only the evidence that Haugen, or lawyers acting at his direction, wish to offer, but also the evidence of Haugen's incompetence. *See Panetti*, 551 US at 949 (requiring "fair hearing"); ORS 137.463(4)(a) (requiring "appropriate inquiry").

The majority decides otherwise and finds significance in this court's denial of Simrin and Goody's petition for a writ of mandamus, in which they objected to the substitution of Scholl as counsel for Haugen. At the time that this court denied that petition, however, this court did not know that Scholl would not proceed as Simrin and Goody had and would not challenge Haugen's mental competence or offer relevant evidence of Haugen's incompetence, including Dr. Lezak's testimony. Had Scholl done so, there would have been no question that the terms and purpose of the writ had been met. And, in any event, denial of a petition for writ of mandamus does not constitute a ruling on the merits of the issues raised. *See North Pacific v. Guarisco*, 293 Or 341, 346 n 3, 647 P2d 920 (1982) (because mandamus is extraordinary and discretionary remedy, denial of petition is not binding on determination of issue); *State ex rel Venn v. Reid*, 207 Or 617, 633, 298 P2d 990 (1956) (nothing said in denying writ "is res judicata as to the merits of the controversy").

The majority also suggests that Scholl's decision not to present Dr. Lezak's opinion was manifestly correct and this court should defer to Scholl's expertise. The majority notes that Scholl stated that he could have offered Dr. Lezak's affidavit if he had thought that it would be useful, but that he had decided not to do so because the affidavit "did not seem thorough or complete," and he "would not try to establish anyone's

10

incompetency in court or otherwise with the information in that document." However, when OCRC filed Dr. Lezak's affidavit in this court, it did not intend that that affidavit would substitute for Dr. Lezak's testimony.[5] It is therefore not surprising that Dr. Lezak's affidavit summarized her conclusions and itself was not thorough or complete. If Simrin and Goody, or alternate counsel, had been permitted to offer Dr. Lezak's opinion, they certainly would have offered more than Dr. Lezak's affidavit.

In the affidavit that he filed with this court, Scholl does not aver that he had actually interviewed Dr. Lezak to learn the basis for her conclusions or that he had asked her for a more complete report. Nevertheless, Scholl decided that Haugen was mentally competent and that he must abide by Haugen's directions. Whether Scholl was correct in that decision is not, however, the question before us. The question before us is, instead, whether Judge Guimond himself should hear, consider, and evaluate all of the relevant evidence.

It is true that Judge Guimond held an evidentiary hearing on September 27,

---

[5] As Simrin and Goody explained to this court in the letter that we construed as a petition for a writ of mandamus, the death warrant hearing that was held on May 18, 2011, was originally scheduled for May 13, 2011. Before that date, Simrin and Goody had been operating under the assumption that the hearing would be continued to give Dr. Lezak time to write a complete report and testify in person. However, on May 13, Judge Guimond agreed with the state that the applicable statute required the hearing to be conducted within 30 days of the issuance of the appellate judgment and, therefore, declined to continue it. Because Dr. Lezak was then out of the country, Simrin and Goody filed their own declaration summarizing Dr. Lezak's opinion. Later, as noted, Dr. Lezak also signed a sworn affidavit summarizing her conclusions, which OCRC attached to the petition for writ of mandamus that it filed with this court.

11

2011, and that Haugen had legal counsel at that hearing.[6] But at that September hearing, as at the May hearing, Judge Guimond again heard only the evidence that Haugen chose to present. That Haugen was represented by counsel in September does not change the fact that, on both occasions, Haugen controlled the evidence of his own competence that Judge Guimond heard and considered. It is wrong for this court to refuse to acknowledge that that circumstance resulted in a flawed procedure -- one in which Judge Guimond failed to consider relevant expert evidence of Haugen's incompetence. And it is wrong for this court to refuse to correct that error.

I firmly believe that the writ that this court issued required Judge Guimond to permit Simrin and Goody, or if necessary, other alternate lawyers, to present a challenge to Haugen's mental competence to be executed and the opinion of Dr. Lezak that Haugen is incompetent. If, however, because this court failed to anticipate Simrin and Goody's discharge as counsel for Haugen, the writ was not sufficiently clear, then this court should accept responsibility and issue a more specific order now. But either way, this court should act.[7]

In a death warrant proceeding, it is the trial judge who decides whether, as a matter of fact, a defendant who is sentenced to death is mentally competent to be

---

[6] That hearing was continued on October 7, at which time Judge Guimond entered findings of fact and conclusions of law.

[7] We also should not consider ourselves bound by the arguments of OCRC. We can determine the procedure that the constitution and statutes require and mandate that it be followed.

12

executed. ORS 137.463(4)(a). This court must ensure that the procedure that the trial judge uses to make that factual decision accords with constitutional and statutory mandates. If the required procedure is followed, then, like the rest of society, this court trusts that whatever factual decision the trial judge makes will be the correct one. The correct procedure helps ensure the reliability of the result. In a death warrant hearing, the result affects not only the defendant, who has committed unthinkable crimes warranting a death sentence, but also the people of this state who impose that penalty. For society, what is at stake is "'our collective right as a civilized people not to have cruel and unusual punishment inflicted in our name.'" *Whitmore v. Arkansas*, 495 US 149, 172, 110 S Ct 1717, 109 L Ed 2d 135 (1990) (Marshall, J., dissenting) (quoting *Franz v. Lockhart*, 700 F Supp 1005, 1024 (ED Ark 1988)). The majority errs in concluding that the procedure that has been followed in this case is sufficient to that end.

Every day I trust that truth will be the victor if the facts are subjected to a fair adversary process. When I am assured that a fair process has been followed, I trust the decision of the judge or jury to such an extent that I can join my colleagues in affirming the sentence that results -- even a death sentence that will be carried out, at least in part, in my name. But here, I have no such assurance, and I can neither trust nor join.

I can only, respectfully, dissent.

De Muniz, C. J., and Durham, J., join in this dissenting opinion.

13

DE MUNIZ, C. J., dissenting.

I join with Justice Walters's dissent, but write separately in an effort to clarify the issues, at least as they appear to me.

The alternative writ of mandamus that this court issued was clear on its face. It expressly required the trial court to take certain actions or show cause for not doing so. Those actions were: (1) order the Oregon Health Authority to assess Haugen's mental capacity; (2) hold an evidentiary hearing to determine whether, as a matter of law, he was competent to be executed; and (3) permit lawyers Simrin and Goody -- identified by name in the writ -- to submit evidence regarding Haugen's capacity to make a competent, knowing and voluntary waiver of his right to counsel, as well as evidence pertaining to his mental competency. The trial court, for its part, agreed to follow the requirements set out in the writ.

With regard to the competency hearing that was to follow, it is a certainty that Simrin and Goody would have offered into evidence the opinion and testimony of Dr. Muriel Lezak, Ph.D., a neuropsychologist licensed to practice psychology in Oregon and a Professor Emerita, Neurology, at Oregon Health Sciences University -- that is, had they been given the opportunity to do so. Dr. Lezak is an acknowledged authority in the field of neuropsychology and her book, *Neuropsychological Assessment*, is recognized as an authoritative text on the subject.[1] At the behest of Simrin and Goody, Dr. Lezak

---

[1] In *U.S. v. Hammer*, 404 F Supp 2d 676, 706 (2005) a United States District Court made the following findings regarding Dr. Lezak's professional credentials:

1

conducted a five-hour neuropsychological assessment of Haugen and executed a sworn affidavit that was subsequently tendered to this court setting out her ultimate conclusions in writing.  In it, Dr. Lezak stated that, in her professional opinion, Haugen

> "does not have a 'rational understanding' of the connection between the crime and the punishment in this case.  Instead, in my opinion he suffers from a delusional disorder that makes him incompetent to be executed."[2]

She also stated that she was willing to testify regarding that opinion and the reasons underlying it at a hearing.

The trial court, however, never afforded Dr. Lezak the opportunity to so testify.  Before her opinion could be received as evidence at Haugen's competency hearing, the trial court granted Haugen's *pro se* motion to discharge Simrin and Goody, and appointed new counsel to represent him.  The trial court then granted a second *pro se* request made by Haugen and excluded Dr. Lezak's opinion from consideration during the

> "221. Muriel Lezak is an authority in the field of neuropsychology and she wrote the text, *Neuropsychological Assessment*.  (U) [undisputed]."

> "222. *Neuropsychological Assessment* is an authoritative text in the field of neuropsychology."

[2]    As the Supreme Court held in *Panetti v. Quarterman*, 551 US 930, 960, 127 S Ct 2842, 168 L Ed 2d 662 (2007):

> "Gross delusions stemming from a severe mental disorder may put an awareness of a link between a crime and its punishment in a context so far removed from reality that the punishment can serve no proper purpose.  It is therefore error to derive from *Ford* and the substantive standard for incompetency its opinions broadly identify, a strict test for competency that treats delusional beliefs as irrelevant once the prisoner is aware the State has identified the link between his crime and the punishment to be inflicted."

2

death warrant hearing.[3]   As a result, this court's express requirement in the writ that Simrin and Goody be permitted to submit evidence regarding Haugen's mental competence was not followed.  As the court of last resort in this state, we should not allow a mistake of that magnitude to go uncorrected.

If I appear jealously protective of the Oregon Supreme Court's authority in this matter, it is because I am.  The legislature has assigned this court an extraordinary responsibility when a man or woman in this state has been sentenced to die for crimes that they have committed.  ORS 138.012(1) charges this court with "direct and automatic review" of a death sentence, an appellate procedure that takes place whether or not a defendant asks for it. *See* ORAP 12.10 (1) (automatic review of death sentence occurs without defendant filing notice of appeal).  The purpose of our automatic review is to ensure *to a legal certainty* that the trial courts have fully and fairly carried out the processes leading to the execution of a human being, including the careful consideration of all relevant evidence.

In this case, we determined that lawyers Simrin and Goody must be permitted to submit evidence from Dr. Lezak regarding Haugen's competency to the trial

---

[3]   The fact that the trial court apparently sealed Dr. Lezak's written assessment of Haugen's competence in September 2011 is of no moment here.  This court received Dr. Lezak's affidavit stating her ultimate conclusions in June 2011 as part of the documents originally submitted by the OCRC in this matter and it has freely considered those documents during its deliberations ever since.

court with the expectation that that evidence -- like all the evidence that preceded it -- would be given due consideration. The trial court was entitled to give Dr. Lezak's testimony and her opinions as much or as little weight as they deserved, and it was certainly within the trial court's authority to allow Haugen to discharge his lawyers after that evidence was taken. The trial court, however, was not authorized to simply ignore evidence relevant to Haugen's competence to be executed, whether that was Haugen's wish or not.

This court has the authority to "make *and enforce* all rules necessary for the prompt and orderly dispatch of the business of the court[.]" ORS 2.120 (emphasis added). It should do so here. The legislature has mandated that, after a death warrant hearing has taken place, there shall be no appeal from a trial court's decision to issue the resulting death warrant and set an execution date. ORS 137.463(8). As part of that hearing, however, the legislature has also required Oregon trial courts to conduct an "appropriate inquiry" into the defendant's mental condition and to "make findings on the record whether the defendant suffers from a mental condition that prevents the defendant from comprehending the reasons for the death sentence or its implication." ORS 137.463(4)(a). This court's purpose in issuing a writ of mandamus here was to ensure absolute compliance with those procedures before a nonappealable death warrant was issued and Haugen's execution date was set. A death warrant proceeding in which relevant evidence goes unconsidered by a trial court, in direct contravention of a determination made by this court, is not the "appropriate inquiry" statutorily mandated by the legislature, and is not consistent with state and federal constitutional requirements.

4

Haugen has repeatedly expressed his desire to be executed, and he may well be legally competent to receive that penalty for his horrible crimes. His desire to be put to death, however, does not excuse this court's failure to require strict adherence to the legislature's mandated procedures in this, and every other, death penalty proceeding.

I respectfully dissent.

Durham and Walters, JJ., join this dissenting opinion.